NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-353

KATHLEEN ROMANO

vs.

CITY OF LAWRENCE & another.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury awarded Kathleen Romano, the plaintiff in this case, $500,000 in emotional distress damages and $1 million in punitive damages on her retaliation claim under G. L. c. 151B, § 4, the defendants, the city of Lawrence and Lawrence public schools,[2] moved for judgment notwithstanding the verdict or, in the alternative, for a new trial.  The defendants also sought to have the damages the jury awarded remitted.  The trial judge

_____

[1] Lawrence public schools.

[2] At trial, the parties agreed that although there were technically two defendants, "the liability of one is completely tied to the liability of the other," and the jury were not asked to make separate determinations as to the liability of the two defendants.

denied this motion and entered an amended final judgment.  The

defendants have now appealed.[3]  We affirm the amended judgment.

Facts.  The jury could have found the following facts.

Romano spent twenty-five years in the military, eventually

reaching the rank of major before retiring from military

service.  In 2009, after retiring from the military, Romano

became the "Senior Army Instructor" (SAI) at Lawrence High

School's Junior Reserve Officers' Training Corps (JROTC)

program.  At the time of the relevant events, four "Army

Instructors" (AIs), as well as Romano, worked in the JROTC

program at Lawrence High School.

The SAI "manages the entire program" in a particular

school.  Any other AIs in the program "work for the SAI."

Schools can only employ in their JROTC programs people who have

been certified by the Army as instructors.  While instructors

---

[3] The defendants' notice of appeal states that they are appealing from the amended final judgment entered on February 10, 2023, and from "all prior interlocutory rulings and orders," and lists as examples the order on the defendants' motion to dismiss, the orders on the defendants' motion for judgment notwithstanding the verdict, or in the alternative, for a new trial or remittitur, and two orders related to the plaintiff's efforts to obtain attorney's fees and costs.  The defendants, however, have advanced in their brief only arguments related to the judge's orders on their motion for judgment notwithstanding the verdict, or in the alternative, for a new trial or remittitur; therefore, any potential issues related to these other orders identified in the notice of appeal are waived.  See Police Dep't of Salem v. Sullivan, 460 Mass. 637, 640-641 (2011).

work for the school, these programs are still subject to Army rules and regulations, and the Army has the right to remove instructors for unsatisfactory conduct or performance by decertifying them. The SAI is the direct supervisor of the AIs, and the relevant Army regulations allow the SAI to initiate a performance improvement plan for AIs who perform poorly. If, after such a plan is implemented, the AI's performance continues to be unacceptable, the SAI may recommend that the Army decertify the AI, which would lead to their removal.

Romano and one of the AIs, Paul Ronan, had a long history of disagreements. When Romano spoke to her then boss Ted Lombardi, an assistant principal and, later, principal at the school, about Ronan's behavior and their disagreements, he told her to approach the situation as if the two of them were a married couple "having a spat."

In December 2015, Romano was involved in a car accident and broke her back. As a result, she took medical leave until April 2016. When she returned to work, she found that, in her absence, the number of community service missions the student cadets were going on had decreased and the typical afterschool JROTC programs were not being undertaken.

Upon her return, Romano's and Ronan's relationship deteriorated further; in every meeting, Ronan yelled at Romano in front of the other AIs.

At some point in the spring of 2016, after Romano returned to work, Ronan informed her that he refused to work over the summer -- something Romano was adamant that the JROTC staff were required to do. In June 2016, after this incident, Romano decided that she wanted to file a formal complaint about Ronan's behavior and told Lombardi so. Lombardi told Romano not to move forward with her complaint because she did not understand the politics of Lawrence public schools and the school district would "crush [her]."

Shortly after this conversation, Lombardi left the Lawrence school system and was replaced by Juan Rodriguez.

None of the AIs worked during the summer of 2016. At the beginning of the new school year in August, Ronan again angrily confronted Romano, this time screaming at her because he did not want to teach a class she had assigned to him.

After this, Romano spoke with Rodriguez about the conduct of Ronan and one of the other AIs, John Helbert. Rodriguez told Romano that he needed to speak with the headmaster, Michael Fiato, and potentially human resources, given the nature of her complaint. Two weeks later, on September 14, 2016, Romano, Rodriguez, and Fiato all met. Fiato stated that he would investigate Romano's allegations.

On September 28, Romano, Rodriguez and Fiato met again. At this meeting, Fiato told Romano that she was not in charge of

4

the other AIs and the JROTC program; she was only a figurehead, and all the JROTC staff members were peers. Romano asked Fiato to look at the relevant Army regulation and call Brenda Gainey, the chief of the Second Brigade of JROTC, as they would confirm that she was supposed to be running the program. Fiato agreed to do both.

On October 18, Romano met with Fiato and Anne Marie Stronach, the chief operations officer for Lawrence public schools. They discussed the ongoing conflicts between Romano and the AIs and, at one point in the meeting, Romano, in describing her work environment, described herself as "an abused woman." Stronach took this to be a complaint about gender discrimination, harassment or a hostile work environment and told Romano that she would have to investigate it.

On November 16, Romano, her union representative, Rodriguez, Fiato, and Stronach had another meeting. At that meeting, the school administrators acknowledged that the JROTC program had a chain of command and the SAI was responsible for running the JROTC program. The administrators, however, told Romano that they wanted to wait until Gainey came and visited the school and the program before returning Romano's full scope of authority to her.

That same day, Ronan again confronted Romano. During a staff meeting with the cadets, a cadet Romano had relieved from

5

duty stood up to brief the group. Romano told her to sit down, but Ronan contradicted her and told the cadet to stand up and give her brief. At the end of the meeting, Romano told another cadet to make sure that the cadet who had given the brief, along with one other cadet, were both reduced to lower ranks. In front of the assembled cadets, Ronan began screaming at Romano about this decision, telling her that she could not reduce the cadets' ranks. Romano retreated to her office, where she called Fiato and asked him to keep Ronan away from her. The school security guard walked her to her car, and once she got in her car, she began to cry.

On November 18, Romano met with her union representative and told him that she could not take working under these conditions anymore. The union representative advised her to go home and to take Family and Medical Leave Act (FMLA) leave until the investigation into her complaint was completed. Romano left school after that meeting, called in sick for the next two days, and scheduled a doctor's appointment so she could get a doctor's note and take FMLA leave. Romano's request for leave was ultimately approved.

On one of the days that she called in sick before going on leave, Romano nonetheless went to a local soup kitchen with some of the cadets and one of the AIs, José Caraballo, who were performing a mission there. One of the cadets at the soup

6

kitchen that evening reported that Romano had told him, "[I]f I catch you standing still again, I'll punch you." The school reported the student's allegation to the Department of Children and Families, and Robert Kujawa, one of the AIs, reported it to the Army by way of a "Serious Incident Report." The Department of Children and Families "screened out" this report two days after it was filed. Stronach learned that this report had been screened out on December 6.

In response to both Romano's allegations about the AIs creating a hostile work environment and the report that Romano had threatened a cadet, Timothy Ferguson, an Army lieutenant colonel, investigated the Lawrence High School JROTC program on behalf of the Army. During that investigation, Ferguson spoke with Fiato. Before that meeting, Fiato had spoken to the AIs, and they told him that they were not sure whether the situation with Romano was repairable after the investigation into her allegations about their conduct. Fiato conveyed the AIs' feelings to Ferguson and stated that he believed Romano was unfit to continue leading the JROTC program and the program needed a new leader to be effective. Ferguson also spoke with the AIs, some of whom told him that they did not believe Romano, as SAI, was their superior and that the use of their military ranks was merely a formality. In his report on his investigation, Ferguson concluded that Romano was not fit to

7

continue as the SAI and recommended that she undergo a fitness for duty examination.

On May 5, 2017, Romano filed a complaint alleging discrimination with the Massachusetts Commission Against Discrimination (the commission). Lawrence public schools filed a position statement with the commission in June 2017, in response to Romano's complaint. In that position statement, Stronach, on behalf of the school system, asserted that Romano "wrongfully believes that Army Regulations apply to her job at [Lawrence public schools]" and "military rank is not relevant" to the JROTC staff's activities. Romano ultimately withdrew her complaint before the commission to pursue this civil action. See G. L. c. 151B, § 9.

On November 24, 2017, Romano received a letter from the Army informing her that she had been flagged during a background check due to the Serious Incident Report related to the soup kitchen incident. The letter informed her that the flagged finding needed to be reviewed by the "Centralized Adjudication Authority," and an adverse finding from that authority could lead to the loss of her certification.

In December 2017, Romano resigned from her position with Lawrence public schools and obtained disability retirement benefits.

8

Discussion.  1.  Adverse employment action and causal connection.  The defendants argue that the judge should have granted their motion for judgment notwithstanding the verdict or a new trial because there was insufficient evidence to support Romano's retaliation claim.

We review the denial of a motion for judgment notwithstanding the verdict to determine whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff."  Dobos v. Driscoll, 404 Mass. 634, 656, cert. denied sub. nom. Kehoe v. Dobos, 493 U.S. 850 (1989), quoting Poirier v. Plymouth, 374 Mass. 206, 212 (1978).

As for the defendants' request for a new trial, we review a trial judge's decision on such a motion for abuse of discretion. W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass. App. Ct. 744, 748 (1993).  A trial judge should grant a motion for a new trial in a civil case only where "the verdict is so markedly against the weight of the evidence as to suggest that the jurors allowed themselves to be misled, were swept away by bias or prejudice, or for a combination of reasons, including misunderstanding of applicable law, failed to come to a reasonable conclusion."  Id.

"[T]o make out a prima facie case of retaliation" under G. L. c. 151B, § 4 (4), (4A), Romano was required to show "that [s]he engaged in protected conduct, that [s]he suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action" (quotations and citations omitted).  Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011).

Here, the defendants argue that Romano has not established that she suffered an adverse employment action; or, even if she did suffer an adverse employment action, that it was causally connected to her protected activity:  complaining about gender discrimination by describing herself as an "abused woman."

For the purposes of G. L. c. 151B, an adverse employment action occurs when the employee suffers a "[m]aterial disadvantage" (citation omitted).  Yee v. Massachusetts State Police, 481 Mass. 290, 296 (2019).  Such a disadvantage must be "objectively apparent to a reasonable person in the employee's position; subjective feelings of disappointment and disillusionment will not suffice" (quotation and citation omitted).  Id. at 297.

The defendants characterize the reduction in Romano's authority as nothing more than a temporary misunderstanding, or the result of the administration's failure to ensure she was treated with proper deference.  We do not agree.  The relevant

10

Army regulations make it clear that "[t]he SAI is in charge of the JROTC unit" and that the SAI, therefore, manages the program and supervises the other AIs. Lawrence public schools deprived her of both of these functions. Given that Lawrence public schools deprived her of core functions the Army regulations assign to those in her role, the disadvantage inflicted on Romano would have been objectively apparent to a reasonable person in her shoes and, as the judge concluded, the jury could have found that the restriction of Romano's authority was an adverse employment action.

The defendants argue next that, even if the reduction in her authority was an adverse employment action, Romano has not shown that this action was causally related to her protected activity because her authority was reduced before she told Fiato and Stronach that she felt like an "abused woman."

The judge explained three ways in which the jury could have determined that the reduction in Romano's authority was causally related to her protected complaint of gender discrimination. We need go no further than the first.

The jury could have found that Lawrence public schools restricted Romano's supervisory authority on September 28, 2016, due to its mistaken understanding of the JROTC program's structure. However, by the time of the November 16 meeting, the school administrators had spoken with Gainey and been informed

11

that they were wrong, that military rank did apply within the JROTC program, and that the SAI had greater authority than the other AIs. Despite the fact that Gainey had already disabused them of any confusion around the structure of the JROTC program, the school refused to restore Romano's authority to her at that time, and instead stated that they wanted to wait until Gainey had conducted a site visit. We agree with the judge that, based on these facts, the jury could have found that Lawrence public schools' refusal to reinstate Romano's authority after learning of its mistake was causally related to her earlier protected activity.

The jury could have found additional support for a conclusion that the defendants acted with a retaliatory motive from the following facts: (1) Lombardi, the principal of humanities leadership development at Lawrence High School at the time, told Romano not to formally complain about Ronan because she did not "understand the politics" and Lawrence public schools would "destroy" her; (2) after Romano's complaint, Fiato asked the AIs if they could continue to work with her, they told him they were not sure, and Fiato then told the Army he thought the program needed a new SAI; and (3) after learning that Romano had supervisory authority over the AIs and the JROTC program, Lawrence public schools falsely stated in its position statement

12

before the commission that Romano was in the wrong for believing that military rank applied to the JROTC program.

There was ample evidence in the record to support a reasonable inference in favor of the plaintiff, and no error in the judge's decision to deny the defendants' motion for judgment notwithstanding the verdict. Likewise, there was no abuse of discretion in the judge's decision to deny the defendants' alternative request for a new trial.

2. Compensatory damages. The defendants also argue that the jury's compensatory damage award was excessive, and the trial judge should have granted them a new trial or, at least, remitted some of the damages under Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974).

"[A]n award of damages must stand unless . . . to permit it to stand was an abuse of discretion on the part of the court below, amounting to an error of law" (citation omitted). Reckis v. Johnson & Johnson, 471 Mass. 272, 299 (2015), cert. denied sub nom. Johnson & Johnson v. Reckis, 577 U.S. 1113 (2016). Allowing a damages award to stand constitutes an error of law "if the damages awarded were greatly disproportionate to the injury proven or represented a miscarriage of justice" (citation omitted). Id.

As the judge noted, the jury could have found that after the meeting on November 16, and throughout her leave, Romano

experienced emotional distress due to Lawrence public schools' failure to reinstate her authority and its statements to the commission in which it continued to assert that she did not have that authority.

Further, Romano's testimony and that of her family members reflected that she suffered a high degree of emotional distress. Of particular note, Romano testified that she was voluntarily committed to inpatient therapy twice, her family moved from Andover to Boston because she could not face the reminders of her time at Lawrence High School that she encountered living in nearby Andover, and her husband had to take over all of her roles in their household. Her daughter described her as a "shell of a human."

Given this, the jury's award of compensatory damages was neither "greatly disproportionate to the injury proven" nor "represented a miscarriage of justice" (citation omitted). Reckis, 471 Mass. at 299. Consequently, the judge did not abuse his discretion or commit an error of law in allowing the award to stand.

3. Punitive damages. Finally, the defendants contend that an award of punitive damages was unwarranted in this case, or, in the alternative, that the amount of punitive damages the jury awarded Romano was excessive.

14

Punitive damages are available under G. L. c. 151B "where the defendant's conduct is outrageous or egregious." Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 110 (2009), S.C., 455 Mass. 1024 (2010). "An award of punitive damages requires a determination of the defendant's intent or state of mind, determinations properly left to the jury, whose verdict should be sustained if it could 'reasonably have [been] arrived at . . . from any . . . evidence . . . presented.'" Id. at 107, quoting Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1, 16 (1998).

Factors relevant to whether the defendants' conduct was outrageous and egregious include:

> "1.  whether there was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class);
>
> "2.  whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;
>
> "3.  the actual harm to the plaintiff;
>
> "4.  the defendant's conduct after learning that the initial conduct would likely cause harm;
>
> "5.  the duration of the wrongful conduct and any concealment of that conduct by the defendant."

Haddad, 455 Mass. at 111.

Here, as the judge noted, the jury could have found that the defendants' conduct was outrageous or egregious based on

15

evidence that after learning and acknowledging that they had been mistaken about the structure of the JROTC program, the defendants not only failed to return Romano's authority to her, but they continued to maintain before the commission a position they knew was incorrect -- that Romano did not have any supervisory authority.  The jury could also have found that the defendants never informed the AIs about the administration's new-found understanding of the SAI's role, based on the fact that the AIs continued to assert in their comments to Ferguson and their trial testimony that Romano was their peer, not their superior.  This conduct clearly falls within the ambit of the fourth and fifth factors listed above and supports a finding that the defendants' conduct was outrageous and egregious.

Further, as described above, the jury could have found that Romano suffered substantial actual harm in the form of emotional distress due to the defendants' conduct.  On this record, the jury could reasonably have determined that punitive damages were warranted.

As to the amount of punitive damages, as public entities, the defendants do not have any Fourteenth Amendment rights which would place a constitutional limit on the amount of punitive damages that may be assessed against them.  Charles v. Leo, 96 Mass. App. Ct. 326, 348 (2019).  A punitive damages award against a public entity, however, may still be reviewed for

16

excessiveness on a motion for a new trial or remittitur under rule 59 (a). Id. To determine whether an award of punitive damages is excessive, we look to the three factors articulated by the Supreme Court in BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996): "'the degree of reprehensibility of the defendant's conduct'; the ratio of the punitive damage award to the 'actual harm inflicted on the plaintiff'; and a comparison of 'the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.'" Charles, supra at 347-348, quoting Labonte v. Hutchins & Wheeler, 424 Mass. 813, 826-827 (1997). See BMW of N. Am., Inc., supra at 575, 580, 583. We review a judge's ruling on a motion for new trial or remittitur under rule 59 (a) based on excessive punitive damages assessed against a public entity for abuse of discretion or other error of law. Charles, supra at 348.

Here, the ratio of punitive to actual damages, an amount we have concluded above is not excessive, is only two to one, well within the permissible range, especially given that the harm Romano suffered was noneconomic. See Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 417 (2013).

As to reprehensibility, as we have already discussed, the jury could have found that even after their confusion about the JROTC program's structure was dispelled, the defendants failed to reinstate Romano's authority, failed to inform the AIs of

17

their new understanding of the program's structure, and maintained before the commission that Romano was the problem and military rank did not apply within the JROTC program.

Finally, as the judge recognized, in the G. L. c. 151B context, comparison of the award to potential criminal or civil penalties neither weighs in favor of nor against remittitur. See Charles, 96 Mass. App. Ct. at 352 (in this context, lack of comparable criminal or civil penalties "does not provide guidance with respect to the appropriate size of a punitive damages award").

The judge, therefore, neither abused his discretion nor committed any other error of law in refusing to remit any of the

punitive damages the jury awarded, or to grant a new trial due to the claimed excessiveness of the punitive damages.[4]

Amended judgment affirmed.

By the Court (Rubin, Hand & Smyth, JJ.[5]),

Clerk

Entered:   July 31, 2025.

---

[4] The plaintiff's motion to file a surreply brief, on which we have not relied in deciding this matter, is denied, except to the extent it contains a request for attorney's fees, to which the plaintiff is entitled by statute.  See G. L. c. 151B, § 9. This request does not comply with the procedure outlined in Fabre v. Walton, 441 Mass. 9 (2004).  Nonetheless, we have discretion to allow a request for attorney's fees that is not made in the brief.  See Beal Bank, SSB v. Eurich, 448 Mass. 9, 12 (2006).  Given the plaintiff's statutory entitlement to the fees and the date of this request, less than a month after plaintiff's brief was filed and more than four months before argument, we allow the request.  The plaintiff may submit a petition with supporting documentation within fourteen days of this decision; thereafter, the defendants will have fourteen days in which to file a response.

[5] The panelists are listed in order of seniority.